The Honorable, the Judges of the United States Court of Appeals for the 4th Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable of the United States Court of Appeals for the 4th Circuit are admonished to draw a nine and give their attention for the court is now sitting. God save the United States in this Honorable Court. You may be seated. I want to welcome everyone to the afternoon session of the 4th Circuit Court of Appeals today. And we have an interesting case, Theodore Bolick v. Ron Sterling, et al. And Mr. Katsky, you're with Duke University? Yes, Your Honor, and thank you. Yes, I'm the director of the Duke Appellate Litigation Clinic. Arguing today will be my former student, Zoe Turner Rosen. With her at counsel table are the other two students who worked on the case, Michael DeLuca and Gabriela Nagle Alvario. Does any of them need to be admitted today? They're already taken care of. They've already been admitted as qualified law students, Your Honor. Yes, sir. We appreciate you being here and your assistance in this matter. It's our pleasure, Your Honor. Very good. Ms. Turner? Good afternoon, and may it please the Court. Zoe Turner Rosen for the appellant, Mr. Bolick. I'd like to reserve four minutes for rebuttal. This Court has made clear for at least three decades that to deprive an inmate of his constitutional right to out-of-cell exercise, prison officials must show exceptional circumstances that make out-of-cell exercise impossible. Those were the words that this Court used in Mitchell. Even then, prison officials need to provide a meaningful alternative. Here, prison officials haven't even offered up any exceptional circumstances, much less demonstrated impossibility. But simpler still, as the magistrate judge concluded, there is substantial evidence in the record that the in-cell exercise pamphlet was wholly inadequate for Mr. Bolick. And any debate about that evidence is a fact question. For that reason, this Court should reverse the summary judgment and remand for discovery and trial. Here, the one justification that prison officials rely on has been rejected by this Court as a matter of law. Essentially, they say, Kirkland had the potential to be a dangerous place. They point to generalized safety concerns, and they say that that justified depriving every single inmate of out-of-cell exercise for extended periods of time. Prisons can always be dangerous. But this Court has never held that that kind of generalized safety justification is sufficient for depriving inmates of out-of-cell exercise. They need something specific, something about Mr. Bolick, something so weighty that it could not be addressed in any other way but to deprive Mr. Bolick and other inmates of out-of-cell exercise. They haven't even tried to do that here. Furthermore, the logic is circular. The prison officials created Kirkland as it exists now. This is the system as they designed it and have maintained it. Is it your position that pediological justifications considered by the Court should be individualized to the petitioner challenging the policy? Yes, Your Honor. Is that your position? Yes, Your Honor. And that's what this Court has always held previously in cases like Mitchell, where this Court articulated the contours of the right, and in subsequent cases like Rivera and Brown and Lyles, where this Court has applied the test. In all of those circumstances, the plaintiffs in those cases were people who had been convicted and charged with particular violent offenses. They'd engaged in violence while they were within the prison. They'd attempted escapes and riots. And even in those cases, the Court said there, well, we're going to need to see an explanation for why those justifications mean that out-of-cell exercise is impossible. Go ahead. All of those cases that you just listed for us are unpublished, so they don't serve as precedent. Do you have any cases you can cite as to that apply Mitchell in a circumstance like this that are published opinions? Your Honor, all of those cases are fully citable for the merits under Federal Rule of Civil Procedure 32.1. As for the clearly established consideration of the qualified immunity analysis, Mitchell is the pertinent and dispositive authority. All of this is is a straightforward application of what this Court said in Mitchell. I'll say also that cases like Brown and Rivera and Lyles, which deal with the question of qualified immunity, are evidence that this Court considered Mitchell as having clearly established the right. How do you define that clearly established right? The right to out-of-cell exercise, which cannot be deprived for an extended period of time. And what's an extended period of time? Well, this Court has never drawn a bright-line rule, and it doesn't need to do so now. We can look to guideposts to have a sense of what might count as an extended period of time. For example, in Mitchell, there was a first- Well, you have right here in your table of contents, you're arguing about 324 days. Yes, Your Honor. Here, Mr. Bollock was deprived of out-of-cell exercise for 324 days. In Mitchell, it was a period of 7 months and then 11 months. In Brown, it was a period of 2 months. And in Brown, this Court pointed to another case from the Eighth Circuit that's Armantrout. Where there, they said that 13 days was insufficient. So we know that if there is a line, it's somewhere between 13 days and 2 months. And maybe if we were in that kind of gray area, this would be a harder case. But here, whether you consider Mr. Bollock's period of deprivation, first 5 months and then 6 months, or the combined 11 months, in either circumstance, it's well out of that gray zone that might exist. Well, this is a reception and evaluation center, and normally they aren't there more than a couple of months. Does that create any problems for your argument? I know your client was there 5 and 6 months. I know that. But typically speaking, at Kirkland, it's 2, 2 1⁄2, 3 months. Yes, Your Honor. That is about the average length of time people spend at Kirkland. And the South Carolina General Assembly recommends even shorter, about 30 days. We think, given this Court's holding in Mitchell, that the policy itself may also have facially, constitutionally problematic aspects of it. We think it might be a problem that all of these inmates are being deprived of out-of-cell exercise for periods of 2 to 3 months. But that's not what this Court has to hold today. Because what we know here is that, as to Mr. Bollock, first that they didn't have a specific justification about him that made out-of-cell exercise impossible. And there are also significant fact questions about whether the alternative they provided, the in-cell exercise pamphlet, was a meaningful alternative, as this Court requires there to be, given his physical disabilities and the overcrowded cells that he was repeatedly assigned to. Well, let's talk about Mr. Sterling a minute. I'm assuming you're staying with your case against him. As to the, is your challenge to the provision of the policy that dictates that inmates in restrictive housing, which this is, shall be provided in-cell pamphlet, the in-cell pamphlet. Are you challenging the pamphlet and the directions therein? Yes, Your Honor. Our claim as to Director Sterling is that he's supervisorily liable for the harm inflicted upon Mr. Bollock because of the policy that he enacted. That's the in-cell exercise pamphlet, the 10.07 policy. Because he had constructive knowledge of the harm that was inflicted upon Mr. Bollock under the Shabby Straw standard that this Court announced. So there, defendants, or excuse me, the appellees argue that Mr. Sterling shouldn't be liable for the harm inflicted here because he had no actual knowledge of Mr. Bollock. But that would write the constructive knowledge standard out of the law. He certainly knew about the policy because it was his job to make it. That's his signature at the bottom of the page. He knew that people were being held at Kirkland for potentially constitutionally problematic periods of time because that was the subject of a class action settlement, which resulted in reporting requirements on his department. That's how we know, even, that people were at Kirkland for periods of two to three months. And we know that he knew that, or should have known in the exercise of his responsibilities, that there's a problem when inmates are deprived of out-of-cell exercise, both because that's what this Court has held and because he was the named defendant in a case concerning the issue squarely in the middle of Mr. Bollock's two periods of incarceration. That's Lyles v. Sterling. All of these things are sufficient for constructive knowledge. So you recognize that he had no actual knowledge of Bollock's specific circumstances? I think there may be questions of fact that could be. Are there any facts in the record? Well, there are the letters that Mr. Bollock repeatedly sent to Director Sterling. I think whether or not he actually received them or read them may well be questions of fact for trial. We don't know? We don't know, Your Honor, no. We don't know whether he read them or received them. We don't know whether he read them. It's as though they were sent. We know that they were sent, exactly. But in either event, it doesn't matter, because actual knowledge alone isn't the standard. It's constructive knowledge, and he certainly had that. There's also the fact that Appellee's defense here You've got one claim here? Yes, Your Honor, the deprivation offense. Against multiple officials. How many? Four? Yes, Your Honor. The warden, the three guards, well, five, actually, and then Director Sterling. Five? Yes, Your Honor. I'll say also about Director Sterling. And you want the trial, you want your claim to be, proceed on all, I guess, all the defendants? Yes, Your Honor. Let me ask you, I discovered your appeal, this is the exercise claim, but how about, are you still appealing the wrongful imprisonment and the denial of medical care claim, those two claims? Are you still pursuing those? Denial of medical care, no, Your Honor. Your Honor, the wrongful incarceration claim is currently the subject of a pending federal habeas petition in district court. So it's not being pursued in this appeal? Once the court, in that case, resolves the habeas petition, then the issue would be properly before this court, but not now, no. It went out on Heck versus Humphrey? Yes, Your Honor. The only claim here is the Eighth Amendment relating to medical care? Related to the deprivation of exercise, Your Honor. Deprivation of exercise, all right. And is it your position that your client was unable to do any of the incel exercises that were described in the pamphlet? Many of them were quite difficult for him, particularly all of the ones that would be to do with his lower extremities because of his preexisting conditions. He had a broken right and left fibula, a broken right femur, crushed bones in both of his heels. He needed to use crutches or a walker in order to ambulate. So maybe he could have been able to do some upper body exercises, but that doesn't address the fact that he needed to be able to exercise his lower body in order to have any meaningful exercise, which is what this court requires. Now, when were those injuries suffered in the context of when he went into custody? So many of his injuries were from a motor vehicle accident before he ever came into custody, and he was still feeling the effects of while he was at Kirkland. And then he also suffered injury, both physical and psychological, as a result of the deprivation of exercise while he was at Kirkland. He developed depression and anxiety and began to have thoughts. I'm trying to focus on the time from the injuries. How many broken bones? Broken right and left fibula, broken right femur, and crushed bones in both of his heels. A broken femur oftentimes are treated with body casts. Did he have a body cast? I'm not sure if he was ever in a cast, Your Honor. I know that he had several surgeries which resulted in plates, rods, and screws being used throughout his body, and then he had physical therapy for a period of several. Crutches and everything. Was he on crutches? He needed to use a cane or a walker. Cane or a walker. Yes, Your Honor. When he was in the cell. Yes, in order to meaningfully exercise. So he had access to a cane and a walker while he was in the cell? I'm not sure that he did that. You made the cell sound like it was really small, and you had two other inmates in the cell. Yes, it was very small. That was the second or, excuse me, the cell he was in during his second stay of incarceration at Kirkland. And the authorities said they prescribed the exercise for him. Well, they didn't quite prescribe exercise for him. What did they do? He repeatedly told them, this doesn't work for me. I need out-of-cell exercise. I'm not able to perform the exercise that you put in this pamphlet, and I'm suffering injury as a result. That's the subject of a number of grievances that he sent to the prison officials during the course of his two extended periods of incarceration. In response, they repeatedly pointed him to the same in-cell exercise pamphlet, saying over and over again, would you like an in-cell exercise pamphlet? The pamphlet they're referring to is just that two-page document referred to in the joint appendix that lists some different calisthenics and exercises. Well, would it be helpful for us to know the size of the cell and when three people were in there, how much room per person there is? Yes, Your Honor. The first cell he was in was three beds stacked, which had less than three feet of space between each of them, such that someone couldn't sit up without breaking their head. What was the size of the cell? He says that there was less than 25 square feet of unencumbered space within that cell. How many feet is that, like feet by feet, or the floor space? So 25 square feet in that cell. I know it's 25 square feet, but is it three by six or four by six? What are the dimensions? I'm not sure of the exact dimensions, especially considering the – Do you have pictures of it in the file? No, Your Honor, and that's something that we would like in discovery if this case is reversed and remanded, additional information about the dimensions of the cells, pictures of the cells. There's also things about his medical record. So the summary judgment was not based on a full record? Well, Your Honor, we think that there is still – You're saying there were appeal in the summary judgment? Yes, Your Honor. Well, and there was no discovery? There was limited discovery in this case, yes. You didn't find out the dimensions of the cells? That was not provided in the initial discovery, no. No pictures? We have no pictures of the records. And part of the space was taken up with a toilet? Exactly, yes. And the sink? Yes. Yes. And then the other cell – Anything else in there to assist them to keep themselves clean? No, Your Honor, they were allowed – Toilet and sink, and then there were two bunks? Mm-hmm, yes. What was the size of the bunks? I don't know the size of the bunks. I think that's another thing we'd want on discovery. Where did the third person sleep? So that's in the next cell during his second period of incarceration. That was the cell where it was a two-person cell with one bunk bed, and Mr. Bollock was the third person in that two-person cell. He slept on a mat on the floor. He slept on a mat? A mat on the floor, yes. Did the bunks have mats on them? I believe they have mattresses, yes. Mattresses? Yes. So there was a steel bunk. Did they fold out? Did these beds or the bunks fold out? I mean, during the normal day, could they fold those into the wall and give them more space to stand up or move around? I see what Your Honor means. My understanding is that no, they could not, but I think that, again, would be something we don't know.  We're not trying to be pesky with you, but you know if you've got a claim here, you've got a cell that's only got five by five space, that's 25 square feet, it would be helpful to know exactly who's where and what's where. Yes, Your Honor, and that's all exactly the kind of thing that we hope would be provided with additional discovery. What we do have here, which creates genuine disputes of material fact, such that summary judgment is appropriate, is all of the evidence that Mr. Bollock put in the record and his complaint, which is a verified pro se complaint, is evidence at this stage and his declaration, which all also counts as evidence here at the summary judgment stage. There were no depositions taken? No depositions, no. We have Mr. Bollock's declaration as well as the declaration of summary judgment. Did you ask for any depositions? He was representing himself pro se below. Pardon? Mr. Bollock represented himself pro se below. You didn't answer my question. So, no, there were no depositions. You didn't ask for any depositions. You weren't representing him at the time. We were not representing him at the time. Did anybody on his behalf ask for depositions? No, and nobody was representing him. He didn't ask for any depositions? He did not, no. And the department didn't ask for any depositions? Nobody on the defense side? My understanding is not complete. I think that there are more things that Mr. Bollock has pointed to in his declaration. Well, we don't even know the size of the cell. We know that it was 25 square feet of uninformed space. It's 25 square feet. Five by five is 25. Yes, Your Honor. The exploits just define a set of dimensions that would fit that. But what are the real dimensions of the cell? How do they get to the 25 square feet? Well, I don't know. No, Your Honor, because that's not something that the prison officials provided in discovery. And, as I said, Mr. Bollock That's in somebody's record somewhere. I would hope so. And I hope that that's the kind of thing that we could have with additional discovery and resolution by a fact finder on these questions of material fact. I see that my time has expired.  But as long as you – that's that red light. And as long as you get questions, you do your best to answer them. Yes, Your Honor. Judge Bollock? No questions. I'm wondering if you – is it your position that your client was unable to do any of the exercises or just not able to do some of them? It's our position that the exercises provided, or rather the in-cell exercise pamphlet provided, was not a meaningful substitute to out-of-cell exercise for Mr. Bollock, which is the standard that this Court articulated. And at the least, given his physical limitations and all of the evidence he put in the record concerning those limitations and the overcrowding in the cells, there's a material question of fact for resolution by a fact finder about whether it was a meaningful alternative, which is the requirement when prison officials seek to deprive an inmate of out-of-cell exercise for an extended period of time. So your argument is specific as to Mr. Bollock? Yes, Your Honor. Although with respect to the director's liability, you're talking about a prison-wide policy or even a statewide policy. So it seems to me a different argument that you're making with respect to the director than with respect to the other defendants. Not entirely, Your Honor. It's different in the sense that Director Sterling didn't have or likely didn't have actual knowledge of Mr. Bollock's particular circumstance and the other officials here did. They were the ones who created it. But because the standard for supervisory liability is constructive knowledge, he doesn't have to. All he has to know is that there's a policy in place that has the potential to cause constitutional harm. Is that a theory of supervisory liability? Yes, Your Honor. And that's what you're after? Yes, Your Honor. It's supervisory liability with the standards articulated in Shaw v. Stroud. And the standard there is... You're trying to nail the boss. Yes, Your Honor. The standard there is that there is constructive knowledge when a policy is so widespread that subordinates wouldn't question it. It's essentially just what everybody does. And that, in fact, is the other prison officials' defense for why they shouldn't be held liable here. In other words, Director Sterling says, I can't be held responsible because all I did was make the policy. And the prison officials say, I can't be responsible because... Did you have... Yes, Your Honor. Is there something sworn from Director Sterling? We do not have a declaration... You said Director Sterling said that. Peter said that. I'll rephrase. That's the argument that... His lawyers say. That's what his lawyers say, Your Honor. Okay. In other words, they're all pointing... We don't know what he says. We don't have a declaration or affidavit from him, no. If we had discovery, we'd know what he said. So if we had a real summary judgment situation, we'd know what he said. Hopefully, with additional discovery, we would get a declaration or affidavit of some sort. Usually, you don't have summary judgment rulings. That's a strict legal question until there's a full record. Yes, and we think that's part of the problem here, is that there are things that additional discovery would reveal, and further, that there are... But they say a lot... The COVID-19 situation, part of this was during the COVID-19. That justifies what went on. The prison officials have actually... Putting three fellows in there and keeping them together. But COVID-19, most of the time, they're trying to separate people. Yes, Your Honor, we think that's a problem, too. We think that's a contradiction. That's outside the record, too, I guess. Well, we have some things in the record relating to this, actually, and the prison officials have explicitly disclaimed, at this point, COVID-19 as a rationale for depriving Mr. Bollock and other inmates of out-of-cell exercise, which makes sense, given what Your Honor is pointing out. Well, sure. Anything else? If Your Honors have no further questions, may I briefly conclude? Pardon? A brief conclusion, Your Honors. Yes, we'll give you a little bit of extra time, and we'll, of course, treat your colleague, Mr. Baldwin, equally. So you may resume your seat there. Yes, Your Honor, thank you. We appreciate you. Thank you. Thank you. Mr. Baldwin, good to have you with us. Thank you, Your Honor. May it please the Court. My name is Brian Mauldin, and I represent the Department of Corrections Defendants. To reverse, this Court must find genuine disputes on three issues, whether plaintiffs suffered a serious deprivation, whether defendants were deliberately indifferent, and whether a violation was clearly established. Turning to that extreme deprivation, the plaintiff did not suffer one. His deprivations of out-of-cell exercise were not extended periods, there were exceptional circumstances, and he did not suffer a serious injury. Well, let's find out exactly how to take a multiple choice test as to an extended time to be denied out-of-cell recreation. What would you say? Five months, six months, seven months, eight, nine, ten? Pick a number that the Department would stand by that somebody ought to be deprived of out-of-cell exercise. Mitchell v. Rice had a total of 17 months as an extended period that was admittedly broken up into seven and 11 months. So let's just pick it. How long should a prisoner be denied out-of-cell exercise? To call it an extended period, certainly no more than 17 months, perhaps a degree less, but you have to factor in exceptional circumstances, and that could go on potentially indefinitely. There are some circumstances, not here, but we could have a homicidal maniac defendant where there simply is no way but to keep them in their cells. So there are no exceptional circumstances here, is that what you're saying? No, Your Honor, not at all. So what are the exceptional circumstances here? The exceptional circumstances are that this is a reception and evaluation facility, a unique circumstances to the cases presented to this court. What happens during reception and evaluation? That's when the prisoners are evaluated. They decide where you're going to send them, which prison they're going to go to, whether it's maximum security or minimum security. What do you do? Well, everything you just said, Your Honor. In addition, you have to factor in rival gang members. There might be more individuals. Gang members, yeah. How many separate prisons do you have in South Carolina? About 20, Your Honor. Twenty? And only one reception center, classification center? Yes, Your Honor. That's this one right here? Yes, Your Honor. Okay. These felons, or this man, could have gone anywhere of the other 19? Eventually, yes, Your Honor, after he had been classified. So that's what you were going to decide while he was there, is which of the other 19 facilities you were going to send him to? That's correct. Okay. And it took you 11 months to decide that? No. It took you – he was in that cell for five months, and then he was out of it for five months, and then he was in it for another six months. So it was about 16 months. It took you all to decide where you were going to send him? Well, I can only assume they weren't working on it in the time that he was out of the R&D center. Oh, they weren't? No, Your Honor. Okay, but in five months you couldn't decide where to send him. The first five months until he got – he made bond because there was a motion granted by one of the appeals courts. Correct? Yes, Your Honor. All right, so he was there five months in this two-man cell with two other guys, 25 square feet. Do you know the dimensions of the thing? I don't, Your Honor. You don't know them either? I can talk from personal experience, not from the record. Pardon? I can talk from personal experience, not from the record, Your Honor. You have some personal experience, you're saying? I've been in a number of these cells. They tend to be more – I might say 4 by 6, Your Honor, just to have a little bit of length. Well, 4 by 6 would be close to that 25 square feet that you're calling. Correct. Okay. But in that five-month period, y'all had not decided, y'all meaning the corrections department, y'all not decided where you're going to send him. That appears to be the case, Your Honor, and who those people were is important. There are classification officers. None of those people are sued here. Are what? Classification officers. That's a dedicated position determining where to place these people. They're not sued here. Is that what you said? That's correct. What difference does that make? Your Honor, the question, this is one of individual liability. No, no, it's individual liability and official. Were they sued officially and individually? They were sued for official liability. They were sued officially and personally, correct? Yes, Your Honor. The court granted summary judgment on the official capacity claim. Plaintiff has not appealed it. All that remains here today are the individual capacity claims. So it becomes highly significant who did what. Isn't that a question of fact? Yes, Your Honor, in the technical sense. Now, as this court pointed out, there are a lot of deficiencies in Plaintiff's case. What he has not done here is complain that he was deprived of discovery, simply that he did not take advantage of it. So if Plaintiff did not determine who it was who was actually responsible for and then the six months, that's Plaintiff's fault. Go ahead, Your Honor. I'm curious. I had to get off a turnip drug yesterday in South Carolina. And I understand exactly how this process works. That started impressing me that he didn't do any discovery. That just doesn't happen in South Carolina. And probably across the country in prison litigation when they're representing themselves. I'm not buying that argument. But what I am interested in is under these conditions for a five-month period, a seven-month period, in the cell that I, from personal experience, can probably tell you the size of it, it just seems to me that there ought to be a question of fact there as to whether it was reasonable to do that constitutionally. Well, Your Honor, to your point, certainly pro se litigants do not represent themselves well or effectively, but this court has made the decision to treat them alike. The fact that he was pro se below and did not do an adequate job of discovery is not itself grounds for a do-over. Oh, I understand that. However, given the, what appears to be, three inmates in a cell that is, it is larger than, well, 25 square feet is probably about right. That's not much larger than this dais up here. If you reconstructed it, cut it in half and put it together, that'd be 25 square feet with three people in there, two beds, a toilet, and a sink. And to be clear, he pointed out they had 25 square feet of unencumbered space, so this isn't including the beds or the sink. That was his estimate. And certainly you're not running laps in that, Your Honor. Agreed. But you can do stationary exercises. Well, let's get back. Could there have been an exception granted for him? Because you used, one of the examples you used is gang violence. Well, the record indicates, I think it indicates, he wasn't a member of a gang, so that's not a reason to keep him away from anybody, I think. So could he have gotten an exception to this? Your Honor, inmates do not like exceptions. Do we have this one inmate, apparently walking with ambulatory aids in front of 1,000, wondering why they're not getting that exercise. Go against discipline. So I don't know that he presented particular dangers, but the... That's obviously a reason, and I can buy into that argument. Was he prescribed exercise by doctors if he had all these injuries? Not that I know of offhand, Your Honor. Now, he was certainly provided with a manual, but that was more standard to every inmate. Yeah. How about day rooms? We've held before, I think, that as long as you've got a day room, where they can get just out of the cell to exercise, is that feasible there at Kirkland? Or exist at Kirkland? I'm not sure that day rooms exist, Your Honor, but what you're proposing is essentially smaller groups of open recreation that presents the same dangers, whether the people in this day room are a danger to one another. And certainly, you go into prison, you might have two guards and a group of 100. The reality is the guards can't do anything about what the 100 might do. The enforcement is the repercussions after the fact. So absolutely, there remain dangers with a group of 50, a group of 100, or a group of all 1,000 at once. Well, how about Mr. Sterling? Is a qualified immunity analysis different from the Director Sterling as opposed to individual officers? Is there any difference in the way we look at qualified immunity? And by that, do you mean clearly established problems specifically or more than merits? Well, let's start with clearly established. Is the law clearly established on how to exercise? Your Honor, and I'll briefly identify five points that are not clearly established, and it does differ according to the defendant. It was not clearly established that two to three months, which was as far as Director Sterling knew, was an extended period. And it was not clearly established that five and six months, which is what the other defendants were aware of, were extended periods. In addition, they had four points in common. It was not clearly established that in-cell exercise manuals are not meaningful substitutes for out-of-cell exercise, a possibility that Mitchel B. Rice acknowledged. It was not clearly established that a high turnover institution with a body of 1,000 inmates of unknowns does not present an exceptional circumstance. Also, that letting inmates out for phone calls, showers, medical, and honoring their medical restrictions was not a reasonable response to any risks. And finally, that it is deliberate indifference not to violate a security policy in such circumstances. And, of course, that one would apply more to the warden and correctional officers, not the superintendent. But turning to the merits of Director Sterling, the Shelby Stroud elements turn on knowledge, not potential. It's your station that as to Director Sterling, he's in a different posture than the rest of the other defendants. Yes, Your Honor. He's the boss man. Yes, Your Honor. It's knowledge or constructed knowledge. So it doesn't have to be actual knowledge. It doesn't have to be actual knowledge of the plaintiff, but the constructive knowledge in this case was, well, in this case all he knew was that the average stay at R&E was two to three months. He had no knowledge or constructive knowledge of plaintiff. What about the letters? If you turn to the magistrate's report and recommendation footnote four, Your Honor, the court explains that these letters never made it to the director. That was the evidence proffered. Plaintiff proffers no evidence to create a genuine dispute on that issue. So if the prison sets up a system where the director never gets access to letters that are sent, then we should assume there's never constructive knowledge? Your Honor, the court can assume Director Sterling had constructive knowledge that inmates were at R&E two to three months without out-of-cell exercise. His knowledge did go that far. It didn't go as far as the five and six months that happened in this case. So why wasn't he aware that some individuals stay longer? In this case, both stays were longer than two to three months. As the director, why wasn't he aware of that? Well, as far as we can tell, Plaintiff was an anomaly. This was interesting that he had not one but two stays well above the average. Now certainly anything is possible. Director Sterling might have been strolling the halls on these days. Plaintiff produced no evidence suggesting that he knew about such outliers. It's Plaintiff's burden to find that constructive knowledge. We would certainly concede that based on legislative reports, official documents, he knew about the two to three month average, but not this five and six month average. Plaintiff states that the South Carolina legislature recommends no more than 30 days at R&E. This comes from a fiscal audit where a SCDC official is quoted as saying the stay at R&E shouldn't be more than 30 days. This was about fiscal responsibility, not cruel and unusual punishment. In any event, this court found in King v. Riley that violations of security policies are not itself constitutional violations. It stands to reason that exceeding the 30 days of some unnamed official does not qualify as deliberate indifference. But turning to the warden and correctional officers, Judge King, you were in a panel this morning, Swartz v. Mieres, where this court was addressing the issue of a warden being alleged deliberately indifferent for following the advice of legal counsel. There wasn't a warden. Well, apologies if I had it wrong. It was an attorney general. Attorney general. There were two attorney generals issuing their advisory opinions. The warden picked one. Two attorney generals, they issued two different opinions. Right, and the warden picked one. The warden won the party. That's right. Well, really we're confronted with a... That's right. The warden had to make a decision. That's right. And I think we're really confronted with... But he was not a party there, yeah. Okay. But really we're looking at kind of a similar situation here. We have rank and file correctional officers. We might have correctional officers with a GED presented with a security policy. Plaintiff expects them... Now, is Director Sterling comparable to a warden? He's the state's boss man. Not in this case. Yes, Your Honor, he's over the state. Okay. The warden's over the R&E facility specifically. There's a warden for each facility. Yes, Your Honor. So you've got 20 wardens. Yes, Your Honor, approximately. And we all report to Director Sterling. Yes, Your Honor. Yeah. And we lump the warden in. I've noticed Director Sterling's in a lot of court cases that come through here. Well, so has the President. I've had other cases with his name on them, yeah. And so has the President, Your Honor. No adverse reflection on him at all. I'm not saying anything. He's sued because of his position in some situations. Yes, Your Honor. And here they're trying to sue him personally as well as officially. And you say the official suit has been dismissed and it's not here. Yes, Your Honor. And we lump the warden in with the correctional officers. They were merely following a policy. It does seem to be that same scenario. Why should a rank-and-file correctional officer decide for themselves, I've read constitutional law, this security policy is unconstitutional, I'm going to violate it? If there are such security officers with the sophistication to decide, yes, this security policy is unconstitutional, they wouldn't be working there long. The prison environment is no place for individuals to decide, I'm going to violate this security policy to ensure this individual's Eighth Amendment rights are not violated. And in any event, look at their actions. They let him out of his cell three times a week for showers and phone calls. They took him to medical. They honored his lower bunk restriction. Now, these were not the actions of men who were acting deliberately indifferent. Plaintiffs' unpublished cases are distinguishable. The court in Brown v. North Carolina Department of Corrections defined deliberate indifference as a failure to avert an easily avoidable danger. That's an element present in all three of these cases. All three cases did deal with individuals, it's true, but that's not the law. The reason they dealt with individuals is because those individuals were singled out. Here, the concerns are institutional, just the fact that we have a series of unknowns. But putting that point aside, in Brown v. Lamina, an inmate was deprived of needed ambulatory aids, resulting in the de facto deprivation of both showers and out-of-cell recreation. No exceptional circumstances were offered for not providing him with ambulatory aids. In Brown v. Lamina, an inmate was deprived, I'm sorry, in Revere v. Mathena, policy required showers and recreation, and guards pointlessly denied the inmate because he slept through the sign-up process without the benefit of an alarm clock, and then they ignored his notes even as they escorted other inmates out to the showers. These are Plaintiff's two cases where two months were found to be extended periods, but they involved deprivation of out-of-cell exercise and showers, which is a material distinction, as the Court found in Lowell v. Sterling. There, the inmate's unit was placed on lockdown and no fault of his own was asserted. This was a 10-month lockdown where he was given one shower a week. He asked, can I have more showers, can I be transferred to another unit? No exceptional circumstances were proffered in that case. So all three are distinguishable in addition to not being binding, as Judge Berner, you observed. So you're suggesting that the deprivation has to include both not being able to shower and not being able to get out-of-cell exercise in order for it to be a constitutional violation? If the period in time is considered two months, yes, Your Honor. Well, that's not what Mitchell says. It doesn't talk about showers. It doesn't, and in that case we were dealing with a cumulative 17 months. But it talked about the need for out-of-cell exercise or for there to be a peniological justification, but those have to be concrete and specific in Mitchell. Your Honor, I don't know that we find the concrete, we might find concrete and specific, but certainly there's not this individualized requirement in Mitchell. But my point simply is that two months without out-of-cell recreation and showers is far more significant than five months without out-of-cell recreation, three showers a week. That is different. Without recreation, this fellow was injured, according to the Duke lawyer. Two fibulas broken, a femur broken, other injuries. Now, the orthopedist and the physical therapist were telling him, I would think to exercise, I've had some situations not that bad, but I know that when I had bones problems, they wanted me to exercise, exercise, exercise. That seems like a pretty difficult situation for a fellow for this period of time with those kinds of injuries. Well, all I know, Your Honor, is that he had pins in his legs. Now, you do point out that... You said pain in his legs? No, pins. I don't know at what stage of healing he was in, but you do point out that he had two doctors, presumably friendly to him, that he might have produced that injury. But a broken femur is a terrible injury. You know what the femur is? Yes, Your Honor. The question is whether it's healed or not. I don't know much about bones either, but I know what that one is. I know it's a terrible injury. I had a son that had one of them. He was in a body cast for months. I haven't looked at his complaint, I mean, to this prayer for relief, but is it purely a complaint for damages, or is it a complaint that he asked for a change of the policy? He did ask for the change of the policy. Now, plaintiff, a month into the case, was sent to another institution, and now he's, in fact, released from SCDC altogether. Adjunctive relief is moot, and he certainly does not represent a class action. Today, he's not in SCDC? Yes, Your Honor. That happened within the past week or two. And his claim was his claim for monetary damages and adjunctive relief was prescriptive, trying to change the policy. You said that was part of his prayer? Yes, Your Honor. My time has expired. Are they asking for adjunction relief here? The briefing does not, that we can tell. No, Your Honor. No one's ever brought that up? No, Your Honor, certainly not developed. Anything else? That's all. Thank you, Your Honor. Thank you very much, sir. Good to have you with us. Ms. Tarner. Your Honors, I'll begin just by clarifying briefly that injunctive relief in this case became moot just a couple of days, really, after Mr. Bollock filed his complaint because it was then, after spending five months being classified for the first time and then returning for a second period of six months, that Mr. Bollock was finally classified for a second time and transferred out of Kirkland into a permanent placement within the South Carolina Department of Corrections. And he was then, as appellees have mentioned, just released from that permanent placement a couple of days ago. So injunctive relief here is moot. He is seeking damages. And that's why this is an as-applied claim. I'll say also that the fact questions that Your Honors identified and that the magistrate judge identified below, questions of fact regarding whether there were any exceptional circumstances here, whether if there were, those circumstances made out-of-exercise impossible, and whether there were any meaningful alternatives offered to Mr. Bollock, all of those questions of fact suggest here, particularly on the record and complete as it is, that summary judgment is inappropriate at this stage. What do you want us to do? We would like this court to reverse and remand for additional discovery and trial, hopefully with appointed counsel below. Have you ever specified what the additional discovery would be before the trial? Yes, Your Honor. Have you ever made a motion to that effect? We haven't made a motion to that effect, but there are all sorts of things. There's nothing in the record, then, that indicates what you want. Well, there's all sorts of things that Mr. Bollock pointed to in his declaration and his complaint that could be identified through further discovery. You stand in his shoes. He was representing himself. Yes, Your Honor. So he did, did he file discovery motions? Yes, he did file discovery motions below. And he's identified additional claims. Were they denied or did they just last? There was discovery below, Your Honor. The appellees did produce documents. They didn't get very much. We don't even know what the size of the cell is yet. Mr. Maldon makes a fairly interesting point. You sued, obviously, the warden. Now, if he were to prevail, there's no question the warden would have to stay in. Sterling, we can debate about. But how about the four of the three amigos there? They're just following orders. I mean, why should they be accountable for damages? They didn't physically harm him. They just did what they were told. They violated his constitutional rights. And it's no excuse to follow a policy. Because they were the handlers, and therefore they're liable. That's your query? Yes, Your Honor. In other words, when prison administration – when prison administrative policies conflict with the United States Constitution, there's a clear winner. And it's the prison officials' responsibility to figure out how to administer the prison as they've designed it in a way that comports with the demands of the United States Constitution. And if it turns out they're, as they say, unable to do so, if they then violate Mr. Bollock's constitutional rights, they can be held to account for that violation. As appellees pointed to – Have you all ever asked for anything other than a trial? Have you ever asked for declaratory relief or injunctive relief? He did ask for injunctive relief initially when he filed his complaint when he was still at Kirkland. Was that on appeal here? No, Your Honor, because injunctive relief is moot. It's still in the case, though. If we remanded – if we were to vacate and remand it, the request for injunctive relief would be viable. No, Your Honor, because it's moot at this point. It's moot? Yes, Your Honor. Why? Because he has been released not only from Kirkland but from the South Carolina Department of Corrections. Okay. Well, I'm talking about as to everybody else, as to the director. Well, the director can still be held supervisorily liable, as we discussed before, and can have a damages award against him. As to injunctive relief, perhaps for the rest of the people at Kirkland who might still be facing the effects of this policy, that would probably require somebody who's still at Kirkland bringing a facial claim for injunctive relief. So what you want is – Is damages, Your Honor. You want damages. You want discovery of damages. Well, I'll say – And then you want to bail out of the case. We'd like to what? I'm sorry. You want to bail out of the case. You all want to leave the case. You're going to say your work's finished. We have people come up here and represent criminal defendants sometimes who didn't have lawyers before. And most times we ask them what they're going to do if they get – if you get a reversal, are you going to stick with this fellow when he goes to trial? And a lot of them say yes. But you all are saying no. Well, Your Honor, unfortunately we're all students. You're leaving town. Pardon? We're all students who just graduated and did this work with the clinic. So we unfortunately wouldn't be able to continue to represent Mr. Bollock. But it's our sincere hope that somebody else would. Anything else? Anything else? Thank you very much. Thank you, Your Honors. And we appreciate, Professor, the efforts of you and all the students at Duke in assisting us and assisting your clients in this case. And counsel for the director and the defendants, we appreciate your work very much. And thank you for it. And we will take the case under advisement. We'll come down and greet counsel.
judges: Robert B. King, Nicole G. Berner, Henry F. Floyd